J. Kevin West, ISB #3337
KWest@parsonsbehle.com
Dylan A. Eaton, ISB #7686
DEaton@parsonsbehle.com
Andrew R. Alder, ISB #9971
AAlder@parsonsbehle.com
Parsons, Behle & Latimer
800 W. Main Street, Suite 1300
Boise, Idaho 83702
Telephone:     (208) 562-4900
Facsimile:     (208) 562-4901

Counsel for Defendants Corizon, LLC, John Migliori, M.D. and David Agler, M.D.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GARY L. MERCHANT,<br><br>             Plaintiff,<br><br>v.<br><br>CORIZON, L.L.C., JOHN MIGLIORI, M.D., DAVID AGLER, M.D., WARDEN KEITH YORDY, and JOHN/JANE DOES I-X,<br><br>             Defendants. | CIVIL ACTION FILE<br><br>NO. 1:17-cv-524-BLW<br><br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS CORIZON, LLC, JOHN MIGLIORI, M.D. AND DAVID AGLER, M.D.'S MOTION FOR SUMMARY JUDGMENT** |

COME NOW Corizon Defendants, by and through their counsel of record, the law firm of

Parsons Behle & Latimer, and pursuant to Federal Rule of Civil Procedure 56 hereby submit this

Memorandum in Support of Defendants Corizon, LLC, John Migliori, M.D. and David Agler,

M.D.'s Motion for Summary Judgment ("Motion for Summary Judgment").

## I.   INTRODUCTION

Late on February 6, 2016, after refusing to be seen in clinic earlier in the day, Plaintiff Gary

Merchant ("Mr. Merchant") – an inmate incarcerated in the Idaho Department of Correction ("IDOC") – intentionally swallowed a pencil sharpener blade. Upon reporting the incident, he was immediately transported to St. Luke's Boise Medical Center. Well <u>after</u> his admission to the hospital, and as a direct result of swallowing the pencil sharpener blade, Mr. Merchant developed necrotizing fasciitis in his left leg, ultimately resulting in an above-the-knee amputation.

Mr. Merchant alleges that Corizon Defendants breached the local standard of care by failing to properly evaluate, examine, diagnose, and treat an infection in his left leg. *Id.* ¶ 16. He claims that Corizon Defendants ignored a medical emergency, and that Corizon Defendants failed to properly care for his Crohn's Disease. *Id.* ¶ 17. Mr. Merchant also alleges that upon returning to prison from the hospital, there was a delay in receiving his prosthetic leg and that Corizon Defendants continued to provide substandard medical care and exhibit deliberate indifference to his serious medical conditions. *Id.* ¶¶ 23, 29. The evidence does not support these conclusory allegations; to the contrary, the undisputed facts show that the Corizon Defendants were at all relevant times responsive to Plaintiff's complaints and medical conditions, and that the medical treatment and care provided was appropriate.

Summary Judgment is appropriate for the following reasons: (1) Plaintiff failed to exhaust his administrative remedies under the PRLA; (2) Plaintiff does not have any medical experts, the omission of which is, as a matter of law, fatal to both Plaintiff's state law negligence claims and Plaintiff's Section 1983 deliberate indifference claim; and (3) Corizon Defendants' medical experts uniformly agree that the care and treatment rendered was appropriate and that the infection was caused by Plaintiff's swallowing of a pencil sharpener blade.

## II.     <u>LEGAL STANDARDS</u>

### A.     Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). " To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact." *Caplinger v. CCA*, 999 F. Supp. 2d 1203, 1212 (D. Idaho 2014), *aff'd sub nom. Caplinger v. Corr. Corp. of Am.*, 634 F. App'x 604 (9th Cir. 2016).

## B.     Deliberate Indifference Standard

To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a prisoner plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).  Prison medical providers can be held liable only if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

## C.     Failure to Exhaust Administrative Remedies Standard

The proper procedural device for determining whether administrative remedies have been exhausted is a motion for summary judgment. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc). The defendant must "prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015). The burden then shifts to the plaintiff to show either that he did exhaust, or that "there

is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Id*.

## III.    FACTS

See Statement of Undisputed Facts ("SUF"), which is incorporated by reference herein.

## IV.    ARGUMENT

### A.    Plaintiff Failed to Exhaust Administrative Remedies

It is a mandatory requirement that inmates must exhaust their available administrative remedies *before* bringing civil rights actions. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  An inmate has properly exhausted all available remedies when the inmate has "used all steps that the [prison] holds out, and doing so properly so that the [prison] addresses the issues on the merits."  *Id.* at 90, 92 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). Proper exhaustion demands completion of the prison's administrative review process, including all levels thereof, in accordance with the deadlines and other critical procedural rules before filing a lawsuit. *Jones v. Bock*, 549 U.S. 199, 204 (2007).

The Ninth Circuit has held that claims for which administrative remedies were not exhausted must be dismissed. "Requiring dismissal without prejudice when there is no pre-suit exhaustion provides a strong incentive that will further . . . Congressional objectives; permitting exhaustion *pendente lite* will inevitably undermine attainment of them." *McKinney v. Carey*, 311 F.3d 1198, 1199-1200 (9th Cir. 2002); *see also Houser v. Corizon*, No. 1:13-cv-6-EJL, 2014 WL 4249873, at *2 (D. Idaho Aug. 27, 2014) (unpublished) ("[P]risoners are required to exhaust all available administrative remedies within the prison system before they can include the claims in a new or ongoing civil rights lawsuit challenging the conditions of their confinement.").

Here, IDOC has adopted a grievance procedure for inmates in its custody. (SUF at ¶ 36.) The IDOC Grievance Process is set out in IDOC Division of Prisons Standard Operating Procedure 316.02.01.001 ("SOP 316"). (*Id.*) As an inmate incarcerated by the IDOC, the Offender Grievance Process has been available to Plaintiff and Plaintiff was educated regarding its use. (*Id.*)

The IDOC grievance procedure consists of three stages. (SUF ¶ 36.) First, any inmate with an issue is required to seek an informal resolution by filling out an Offender Concern Form. (*Id.*) Second, if the issue cannot be resolved informally through the use of a Concern Form, the inmate may then file a Grievance Form, which must contain "specific information including nature of the complaint, dates, places, and names." (*Id.*) The inmate must also include a remedy or means of resolving the issue. (*Id.*) Third, if the decision on an inmate's grievance is not satisfactory to the inmate, the inmate may appeal that decision. (*Id.*) Only upon completion of all three steps is the grievance process exhausted. (*Id.*)

While incarcerated at IDOC facilities from 2009 to the present, Mr. Merchant has submitted five grievances. (SUF ¶ 36.) Two of them, filed in 2009, concern health care and neither was fully exhausted. *Id.* The other three Grievances concern property/commissary disputes. (*Id.*) Mr. Merchant has not filed any Grievances since February 2, 2016. (*Id.*) Specifically, Mr. Merchant has not exhausted the grievance process as to any of the claims against Defendants based on the medical care and treatment provided from January 2016 up to the present. (SUF ¶ 36.) The only Grievances submitted at any time by Mr. Merchant concerning medical care were submitted in October 2009. (SUF ¶ 36.) The Grievances are 10 years old and do not address the time period of medical care and treatment at issue (January 2016 – February 6, 2016 and March 8, 2016 up to the present). (*Id.*) Moreover, those Grievances were not fully exhausted. *Id.* The only Grievance

submitted during the relevant time period was on February 2, 2016. *Id.* That Grievance did not concern medical care but rather related to a dispute about replacing a defective USB cable. (*Id.*).

By filing five grievances – two of which concerned medical care – during the course of his incarceration, Mr. Merchant has demonstrated that he knows about and understands the grievance process and that the grievance process applies to medical care and treatment. Nevertheless, he chose to not even initiate the grievance process – let alone to exhaust it – for any of the claims raised in the Amended Complaint. Thus, for that reason alone, Mr. Merchant's claims should be dismissed for failure to exhaust the administrative grievance process.

**B.    Summary Judgment Is Appropriate Because Plaintiff Does Not Have Any Expert Witnesses To Testify In His Case-In-Chief On Standard of Care And Causation.**

Corizon Defendants filed a separate Motion in Limine to strike Plaintiff's expert witnesses and incorporate herein the arguments set forth in their Memorandum in Support of Motion in Limine. Because the Court should grant Defendants' Motion in Limine and strike Plaintiff's expert witnesses, summary judgment is appropriate as to both Plaintiff's state law negligence claims and Plaintiff's Section 1983 claims of deliberate indifference.

1.    <u>Plaintiff's state law negligence claim</u>

To prevail on a medical malpractice claim under Idaho Law, a plaintiff must prove through "<u>direct expert testimony</u>" that defendants failed to meet the applicable standard of health care practice in the community. §§ 6-1012 and 6-1013. Idaho Code section 6-1012 requires that plaintiffs pursuing claims for medical malpractice present expert testimony regarding the "community standard of health care practice." *Id*. The standard of care in a medical malpractice action is the care typically provided under "similar circumstances" by the relevant type of health care provider in the community at the time and place of the alleged negligent act. *Shane v. Blair*, 75 P.3d 180, 139 Idaho 126 (2003). The expert testimony required by § 6-1012 may only be

MEMORANDUM IN SUPPORT OF DEFENDANTS CORIZON, LLC, JOHN MIGLIORI, M.D. AND DAVID AGLER, M.D.'S MOTION FOR SUMMARY JUDGMENT - 6

provided "if the foundation therefore is first laid[.]" I.C. § 6-1013. Because "direct expert testimony" is required on the issue of standard of care, failing to present such testimony is fatal, as a matter of law, to a plaintiff's case-in-chief.

Expert testimony is also required on the issue of causation. Under Idaho law, "[t]o establish proximate cause, a plaintiff must demonstrate that the provider's negligence was both the actual and legal (proximate) cause of his or her injury. Actual cause is a factual question focusing on the antecedent factors producing a particular consequence. Legal cause exists when it is reasonably foreseeable that such harm would flow from the negligent conduct." *Easterling v. Kendall*, 159 Idaho 902, 367 P.3d 1214, 1226 (2016). In *Coombs v. Curnow*, 148 Idaho 129, 140 (2009), the Idaho Supreme Court stated that although expert testimony is not always required to prove causation in medical malpractice cases, "such testimony is often necessary given the nature of the cases. Expert testimony is generally required because the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury." *Id*. (emphasis added).

The medical claims and causative factors in this case are clearly not ordinarily within the knowledge or experience of laymen composing the jury. The issues concern a serious and complicated infection, which developed in a person who already had numerous comorbidities and was taking several medications, and whether the treatment and care provided (or not provided) by Corizon Defendants was the cause of the necrotizing fasciitis and subsequent leg amputation. The case involves, in part, issues related to a temporal connection between multiple events, which Idaho law treats carefully. *Even expert opinion* "does not meet the requisite standard of reliability when it is based on the mere temporal connection between" some event "and a particular consequence." *See Id.* (citing *Swallow v. Emergency Med. Of Idaho, P.A.*, 138 Idaho 589, 593, 67 P.3d 68, 72 (2003) (holding that in a case where the plaintiff alleged that taking an erroneously

prescribed dose of a drug caused a heart attack, expert testimony was not reliable enough to be considered by the jury because it was based on "the mere temporal connection between the drug and a certain consequence")). Reliable witness testimony is essential in order for Plaintiff to prove that Corizon defendants' care and treatment, or lack thereof, was the causative factor of the necrotizing fasciitis and subsequent amputation.

Plaintiff cannot prevail at trial on a state law medical negligence/malpractice claim without presenting expert testimony in his case-in-chief on both the issue of standard of care <u>and</u> causation. Because Plaintiff does not have any expert to provide expert opinion on <u>one or both</u> of those issues, summary judgment is appropriate.

### 2.    Plaintiff's Eighth Amendment Deliberate Indifference Claim

While expert testimony is not always required to support a claim for deliberate indifference based on medical care, "in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference." *Shields v. Cannon*, No. 2:11-CV-3185 JAM AC, 2015 WL 1258536, at *15 (E.D. Cal. Mar. 18, 2015), *subsequently aff'd sub nom. Shields v. Jones*, No. 15-16372, 2017 WL 4457176 (9th Cir. Oct. 3, 2017). *See also Wolfe v. Idaho Dep't of Correction*, No. 1:13-CV-00227-EJL, 2015 WL 4458862, at *8 (D. Idaho July 21, 2015) (granting summary judgment for failure to provide expert testimony supporting deliberate indifference claim).

Plaintiff's theory of its deliberate indifference claim against Defendants is that they failed to properly treat and/or respond to an infection in Plaintiff's left leg. Yet Plaintiff has no expert to opine as to how the infection started, when the infection started, and where the infection started. Necrotizing fasciitis is a complicated medical condition and Mr. Merchant was a complicated

patient with a long history of numerous medical conditions. In such a case, expert opinion is necessary in order to establish the necessary level of deliberate indifference.

Central to this case is whether the Corizon Defendants appropriately responded to and treated Mr. Merchant's complaints of stomach pain and leg swelling. Mr. Merchant disagrees with the kind of treatment that he was provided. However, "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir.1981). Indeed, "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)); *see also Colligon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the [medical] professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.").

Here, Plaintiff's difference of opinion is not only with his treatment providers, but with well-qualified experts. Accordingly, in light of the complex medical issues and Mr. Merchant's disagreement with the type of treatment he received, expert opinion is necessary in Plaintiff's case-in-chief to establish the necessary level of deliberate indifference.

3.    The Court Should Not Consider Plaintiff's Rebuttal Expert Opinions

To the extent Plaintiff has properly disclosed *rebuttal* experts (and without conceding the admissibility of that testimony), the reports and/or opinions of those rebuttal experts should not be

considered at the summary judgment stage. This Court recently directly addressed this issue, stating that "Rule 56 motions are designed to test the sufficiency of the non-moving party's <u>case-in-chief</u>, and weed out cases which cannot be successfully presented at trial" and that "the purpose of Rule 56 is best served by only considering evidence which the non-moving party <u>could properly submit as part of its case-in-chief</u>." *Ellis v. Corizon, Inc.*, 1:15-cv-00304-BLW, 2018 WL 6268199, at *4 (D. Idaho Nov. 30, 2018) (emphasis added).

In *Ellis*, this Court concluded that "persuasive precedent suggests that the Court is not required to consider rebuttal expert reports from a non-moving party at the summary judgment phase." *Ellis*, 2018 WL 6268199 at *4 (citing *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 581 (4th Cir. 2003) (holding that the district court did not abuse its discretion in declining to consider a rebuttal expert report offered by the non-moving party at the summary judgment phase) and *Daggett v. United States*, No. 08-21026-CIV, 2010 WL 11553196, at *1 (S.D. Fla. Feb. 4, 2010) (declining to consider a rebuttal expert report at the summary judgment phase)). The holding in *Ellis* is now binding on this Court, and the Court should not consider Mr. Merchant's rebuttal expert reports on summary judgment.

**C.     Corizon Defendants' Medical Experts Uniformly Agree That The Care And Treatment Provided By Corizon Defendants Was Appropriate And That The Infection Was Caused By Plaintiff's Swallowing Of A Pencil Sharpener Blade.**

> 1.     <u>The care provided was appropriate and the alleged harm was caused by Mr. Merchant's intentional swallowing of a pencil sharpener blade.</u>

The essence of Mr. Merchant's Complaint is that he did not receive appropriate medical care and treatment "from early January 2016 until he was transported to St. Luke's Regional Medical Center in Boise on February 6, 2016." Dkt. 47 ¶¶ 14-15. Contrary to his claim that Corizon Defendants failed to properly diagnose and treat a severe infection in his left leg and failed to properly care for his Crohn's Disease, the treatment provided was at all times appropriate and

responsive to Mr. Merchant's complaints, despite his multiple refusals to be treated. Moreover, the evidence shows that the necrotizing fasciitis did not develop until <u>after</u> Mr. Merchant was transported to the hospital and was caused by his swallowing of a pencil sharpener blade, not as a result of any care or lack of care by Corizon Defendants.

Mr. Merchant has a long history of drug and alcohol abuse and has numerous complex medical conditions, including Crohn's Disease, congestive heart failure, atrial fibrillation, hypertension, chronic obstructive pulmonary disease, and depression. (SUF at ¶¶ 2-3.) Among other medications, Mr. Merchant has been appropriately prescribed prednisone and Humira, which have potential side effects including arthritis and increased risk of infection. (SUF at ¶ 4.) Lasix has also been prescribed, which he has a long history of refusing. (SUF at ¶ 4.)

On January 22, 2016, Mr. Merchant submitted a health service request for Prednisone due to a Crohn's flare-up. (SUF at ¶ 5.) He was seen by a nurse both on January 22, 2016 and the next day on Saturday, January 23, 2016. (SUF at ¶ 6.) On January 28, 2016, Mr. Merchant was seen by Dr. Migliori, who evaluated Mr. Merchant and started him on a Prednisone taper. (SUF at ¶ 6.) Due to a high INR, an order was given to hold coumadin for 4 days. (SUF at ¶ 6.) Lab work was also done, which was unremarkable. (SUF at ¶ 6.)

On January 29, 2016, Mr. Merchant complained of elbow pain. (SUF ¶ 7.) He was seen the same day, and denied numbness or tingling, and vitals were within normal limits. (SUF ¶ 7.) He was also referred for an appointment with a provider on February 1, 2016. (SUF ¶ 7.) On February 1, 2016, Mr. Merchant was seen by Dr. Migliori, and medications were again prescribed and adjusted appropriately, and a follow-up visit was scheduled for February 4, 2016. (SUF ¶ 8.)

On February 2, 2016, Mr. Merchant submitted an HSR in which he complained, for the first time, of left leg swelling. (SUF ¶ 9.) He complained of water retention, mostly in the left

lower leg. (SUF ¶ 9.) He was evaluated for this complaint the next day on February 3, 2016, at which time it was noted by a nurse that Mr. Merchant had swelling in both legs, and vitals were within normal limits. (SUF ¶ 9.) Also on February 3, 2016, Mr. Merchant submitted an HSR requesting compression socks to control swelling of his legs. (SUF ¶ 10.) An appointment with the provider, Dr. Migliori, was scheduled for the next day.

On February 4, 2016, repeat lab work was also conducted, which showed only minimally elevated white blood cell count at 12.6, a stable hematocrit, and was otherwise unremarkable. (SUF ¶ 11.) Vital signs were within normal limits. (SUF ¶ 11.) He also had a C-Reactive Protein drawn, which was 1.04, only minimally elevated above normal range of <1.0. (SUF ¶ 11.) On February 4, 2016, Mr. Merchant refused to see Dr. Migliori and was angry for some unknown reason. (SUF ¶ 12.) A short course of Lasix and TED hose (both of which had been previously prescribed) were renewed in order to address the leg swelling, and coumadin was started again. (SUF ¶ 12.) The next day, on February 5, 2016, Mr. Merchant received his Humira injection. (SUF ¶ 13.) He also submitted another HSR requesting his Lasix be raised. (SUF ¶ 13.)

On February 6, 2016, Mr. Merchant was again seen by a nurse and vitals were taken, but he <u>refused</u> to return to the medical clinic to be seen by Dr. Migliori in the afternoon. (SUF ¶ 14.) Later on February 6, 2016, at approximately 9:30 p.m., a correctional officer called a nurse to report Mr. Merchant said he had diarrhea because of his Crohn's and that his ankle was swollen. After consulting with the on-call provider, the nurse determined that it was not a medical emergency. It was not a new problem, it was consistent with Crohn's, it was the same complaint for which Mr. Merchant refused to be seen earlier in the day, and a swollen leg is not itself a medical emergency. (SUF ¶ 15.) Approximately one hour later on February 6, 2016, around 10:15-10:30 p.m., Mr. Merchant reported that had swallowed a pencil sharpener blade. (SUF ¶ 16.) After

this was reported to prison and medical staff, Mr. Merchant was promptly sent to the emergency department for further evaluation. (SUF ¶ 16.) The response to Mr. Merchant's complaints on the evening of February 6, 2016 was appropriate. (SUF ¶ 17.)

When Mr. Merchant arrived at the emergency department shortly after midnight on February 7, 2016, he reported to the emergency room doctor, Dr. Nathan Andrew, that he was experiencing a Crohn's flare-up and swallowed the blade because he couldn't take the pain anymore. (SUF ¶ 18.) He complained of right-sided abdominal pain and denied fever, chills, chest pain, shortness of breath, nausea, vomiting, bowel or bladder symptoms, or other acute symptoms. (SUF ¶ 18.) Initially, he did not complain of leg pain associated issues. (SUF ¶ 18.) Dr. Andrew's physical examination indicated swelling and tenderness to the left calf with erythema and edema, but no purple or dark color. (SUF ¶ 19.) He noted a very low-grade fever (38.4), not indicative of necrotizing fasciitis. (SUF ¶ 19.) He did not suspect an infection in the leg. (SUF ¶ 19.)

Dr. Andrew ordered that Mr. Merchant be admitted to the ICU just before 3:00 a.m., at which time necrotizing fasciitis had not been diagnosed. (SUF ¶ 20.) Mr. Merchant was ordered to the ICU due to his atrial fibrillation, evidence of a razor blade in the intestines, and because he was on Coumadin for anticoagulation and at risk for perforation of his intestines. (SUF ¶ 20.) From the time Dr. Andrew ordered Mr. Merchant be admitted to the ICU to when he was actually transferred to the ICU at 5:22 a.m., he was not diagnosed with necrotizing fasciitis (or any infection), nor did Dr. Andrew at any time observe a bulla, pus, open wound, discoloration (other than redness), or excessive bruising on Mr. Merchant's leg. (SUF ¶ 20.)

Caroline Arthur, M.D. was paged to the hospital between 1:00 and 2:00 a.m. and cared for Mr. Merchant until approximately 3:30-4:00 a.m., and she also did not diagnose necrotizing fasciitis or any infection at any point during her care. (SUF ¶ 21.) Dr. Arthur observed left-leg

swelling and some bruising, but no signs of a serious infection. (SUF ¶ 21.) She ordered an ultrasound to test for deep vein thrombosis. (SUF ¶ 21.) If signs of a significant infection had been present, she would have ordered different tests and provided different treatment. (SUF ¶ 21.)

Later in the morning of February 7, 2019, sometime after 5:22 a.m., signs of a serious infection eventually developed. There is no evidence of necrotizing fasciitis or other infection in Mr. Merchant's left leg while Mr. Merchant was still under the care of the Corizon Defendants. (SUF ¶ 22.) Rather, in the opinion of Defendants' qualified infectious disease expert witness, Dr. Harish Moorjani, the infection developed hours <u>after</u> Mr. Merchant ingested the pencil sharpener blade. (SUF ¶ 22.) Dr. Moorjani opines that the swelling in Mr. Merchant's legs that was present at the prison from approximately February 2 to February 6 was associated with Mr. Merchant's ongoing Crohn's disease and associated medications, not a bacterial infection. (SUF ¶ 22.)

Necrotizing fasciitis is a severe soft tissue infection that spreads rapidly. (SUF ¶ 23.) It is often associated with high fever, signs of systemic inflammatory response syndrome, and lab abnormalities such as elevated white blood cell count and C-reactive protein. (SUF ¶ 23.) The medical records, including from St. Luke's emergency department, and the deposition testimony of the first two St. Luke's doctors to treat Mr. Merchant clearly show that necrotizing fasciitis was not present while Mr. Merchant was under the care of the Corizon Defendants, and was not even present throughout the duration of Mr. Merchant's stay in the emergency department. (SUF ¶ 23.)

Dr. Moorjani opines that the infection was caused by and a direct result of Mr. Merchant swallowing the pencil sharpener blade. (SUF ¶ 24.) The pencil sharpener blade, which ultimately lodged in Mr. Merchant's small intestine, caused a laceration and inflammation and, as a result, bacteria in that area entered Mr. Merchant's blood stream. (SUF ¶ 24.) Because Mr. Merchant was on Prednisone – which was appropriate and necessary in order to treat Crohn's disease – he was

more susceptible to infection than an otherwise healthy patient would have been. (SUF ¶ 24.) As a result of the left leg swelling (associated with Mr. Merchant's other medical conditions), the bacterium from the small intestine in the area where the pencil sharpener blade was lodged, made its way to the left leg and caused an infection, which ultimately turned into necrotizing fasciitis and required amputation. (SUF ¶ 24.) Had Mr. Merchant not swallowed the pencil sharpener blade, he would not have developed necrotizing fasciitis and would not have had his leg amputated. (SUF ¶ 24.) The necrotizing fasciitis infection was not caused by any medical care or lack of any medical care on the part of Corizon Defendants. (SUF ¶ 24.)  Mr. Merchant has no contrary expert witness testimony or evidence to present in his case-in-chief as to the cause of the infection.

Evidence in the form of expert witness testimony from Dr. Gary Vile establishes that during the relevant time period Mr. Merchant was being treated at the prison for his Crohn's disease and was managed with multiple medications that were appropriate for this disease, including pain medication, Humira, and prednisone. (SUF ¶ 25.)

Dr. Vilke, as well as another expert witness, Kathy Wild, also establish there was no delay in referring Mr. Merchant to the emergency department for evaluation and treatment of his swollen leg. (SUF ¶ 26.) After Mr. Merchant first reported swelling on February 2, 2016, he was seen by a nurse and scheduled for evaluation by the physician on February 4, 2016. (SUF ¶ 26.) On February 4, 2016, he was seen by a nurse but then refused to be seen by the physician. (SUF ¶ 26.) A short course of Lasix was renewed to help remove some of the fluid, which was reasonable and appropriate. (SUF ¶ 26.) A swollen leg is not considered a medical emergency in and of itself, nor is it consistent with a serious infection, such as necrotizing fasciitis. (SUF ¶ 26.) Lab work and vital signs on February 4th and 6th showed no obvious signs of infection or indication to otherwise

send Mr. Merchant to the emergency department. (SUF ¶ 26.) Additionally, the response to Mr. Merchant's complaints on the evening of February 6, 2016 was appropriate. (SUF ¶¶ 17, 26.)

There is no evidence Dr. Agler or any other Corizon healthcare provider delayed the process of Mr. Merchant receiving his prosthesis. (SUF ¶ 33.) Indeed, the offsite prosthetist specialist, Eric Hinderager testified under oath that the period of time from amputation to receiving the prosthesis, including post-operative rehabilitation, physical therapy, and the casting, ordering, and fitting, was reasonable and not excessively long. (SUF ¶ 33.)

Overall and at all relevant times, the medical care and decision-making as well as use of consultants, radiographs, lab testing, and medications by Dr. Agler, Dr. Migliori, and all other Corizon providers did not deviate from the standard of care, and there is no evidence of any deliberate indifference. (SUF ¶ 34.)

2.    The care provided by Dr. David Agler was appropriate.

Dr. Agler had no involvement in the treatment of Mr. Merchant at ISCC during the relevant time period of January – February 6, 2016 around the time Mr. Merchant was transported to the hospital. Accordingly, the only medical care alleged in the complaint related to Dr. Agler is when Mr. Merchant was transferred to ISCI after March 8, 2016 upon his release from the hospital. Plaintiff has failed to produce any evidence that Dr. Agler's care and treatment of Mr. Merchant deviated from the standard of care, let alone constituted deliberate indifference. Quite the contrary, the expert witnesses for Corizon Defendants uniformly agree that Dr. Agler's care at all relevant times was appropriate and did not breach the standard of care. (SUF ¶¶ 25, 31-35.)

With respect to the alleged delay in Mr. Merchant receiving his prosthesis, there is no evidence that Dr. Agler engaged in any conduct that delayed Mr. Merchant receiving his prosthesis. Mr. Merchant was not initially ready for a prosthetic to be casted or fitted upon his

release from the hospital. (SUF ¶ 29.) Physical therapy was initiated, but he was not compliant, missing numerous appointments and refusing treatment. (SUF ¶ 30.) Ultimately, on April 27, 2016, Dr. Agler determined that Mr. Merchant was able to stand on his right leg and was now a reasonable candidate for a prosthetic. (SUF ¶ 31.) An off-site consult was submitted by Dr. Agler and approved. (SUF ¶ 31.) The process of obtaining the prosthesis was thereafter controlled by an offsite provider at Brownfield's, and there is no evidence that Dr. Agler (or any other Corizon provider or employee) did anything to delay or prevent Mr. Merchant from attending the offsite appointments. (SUF ¶ 32.) The offsite prosthetist, Eric Hinderager, testified that the period of time from amputation to receipt of the prosthesis, including post-op rehabilitation, physical therapy, and the casting, ordering, and fitting, was reasonable and not excessively long. (SUF ¶ 33.)

The record is simply devoid of any evidence that Dr. Agler deviated from the standard of care in his treatment of Mr. Merchant, and thus Plaintiff's state law claim of medical negligence/malpractice against Dr. Agler should not survive summary judgment. Further, there is no evidence that Dr. Agler was deliberately indifferent to Mr. Merchant's serious medical condition. There is no evidence of subjective intent – that Dr. Agler "kn[ew] of and disregard[ed] an excessive risk to [Mr. Merchant's] health and safety" – which Plaintiff is required to show in order to prove deliberate indifference. *Gibson v. Cnty. of Washoe*, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002) (emphasis added). Thus, all claims against Dr. Agler should be dismissed.

### 3.   The care provided by Dr. John Migliori was appropriate.

The expert witnesses for Corizon Defendants uniformly agree that the treatment and care Dr. Migliori provided to Mr. Merchant in January and early February 2016 at ISCC was appropriate and did not deviate from the standard of care. (SUF ¶¶ 25-26, 34-35.) Dr. Migliori had

no involvement in the treatment of Mr. Merchant after Mr. Merchant was admitted to the hospital in the early morning of February 7, 2016.

Specifically, Dr. Migliori saw Mr. Merchant on January 28, 2016 in response to a Crohn's flare-up, and Dr. Migliori started him on a Prednisone taper, which was appropriate and responsive to Mr. Merchant's condition. (SUF ¶ 6.) Additionally, due to a high INR, he issued an order to hold coumadin for 4 days, which was also appropriate and responsive to Mr. Merchant's condition. (SUF ¶ 6.) Dr. Migliori followed up again with Mr. Merchant on February 1, 2016, at which time Mr. Merchant's medications were again prescribed and adjusted appropriately. (SUF ¶ 8.) On February 4, 2016, Mr. Merchant was scheduled to see Dr. Migliori.  He was seen by a nurse and lab work was performed; however, Mr. Merchant became angry for some unknown reason and refused to be seen. A short course of Lasix and TED hose (both of which had been previously prescribed) were appropriately renewed in order to address the leg swelling, and coumadin was started again. (SUF ¶ 12.) Two days later, on February 6, 2016, Mr. Merchant was taken to the hospital and Dr. Migliori had no further involvement.

There is no evidence that Dr. Migliori breached the standard of care in his treatment of Mr. Merchant, and thus summary judgment as to Plaintiff's state law claim of medical negligence/malpractice against Dr. Migliori should be granted. Further, there is no evidence that Dr. Migliori was deliberately indifferent to Mr. Merchant's serious medical condition. There is no evidence of subjective intent – that Dr. Migliori "kn[ew] of and disregard[ed] an excessive risk to [Mr. Merchant's] health and safety" – which Plaintiff is required to show in order to prove deliberate indifference. *Gibson v. Cnty. of Washoe*, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002) (emphasis added). At all relevant times, Dr. Migliori was responsive to Mr. Merchant's complaints and medical conditions.

Even if there were a factual dispute (there is not) as to the appropriateness of Dr. Migliori's treatment and care of Mr. Merchant, there is no evidence in the record that Dr. Migliori's treatment and care of Mr. Merchant *caused* the alleged injury (i.e., necrotizing fasciitis and subsequent amputation). For all of these reasons, all claims against Dr. Agler should be dismissed.

4.    Plaintiff's claims against Corizon should be dismissed

There is no vicarious liability in 1983 actions. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 98 (1978); *Bonner v. Lewis,* 857 F.2d 559, 565 (9th Cir.1988) (doctrine of *respondeat superior* is not applicable in prisoner's claim against Department of Corrections). To assert a § 1983 claim against a private entity, such as Corizon, Plaintiff's must meet the test articulated in *Monell*; *see also Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell,* the requisite elements are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.,* 237 F.3d 1101, 1110–11 (9th Cir. 2001). To create liability, an unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell,* 436 U.S. at 691, 98 S.Ct. 2018 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

First, Plaintiff's *Monell* claim fails as a matter of law because there is no violation of a constitutional right for all of the reasons already discussed above. Second, Plaintiff's *Monell* claim fails as a matter of law because there is no allegation in the Second Amended Complaint and no evidence in the record of any particular "policy or custom" that amounted to deliberate indifference and was the "moving force" behind the constitutional violation. The essence of Mr. Merchant's

claim is that Corizon Defendants failed to diagnose and properly treat an infection in his left leg. There is nothing in the record to suggest that such alleged Constitutional violation is based upon some kind of policy or custom. Courts in this Circuit routinely reject pleadings like Plaintiff's, where liability is premised on a policy or custom as the driving force behind an alleged constitutional violation but the pleading fails to specifically identify the policy or custom or indicate how that policy or custom directly caused the alleged violation. *See La v. San Mateo Cty. Transit Dist.*, No. 14-CV-01768-WHO, 2014 WL 4632224, at *7 – 8 (N.D. Cal. Sept. 16, 2014) (collecting cases). Accordingly, Plaintiff's claims against Corizon should be dismissed.

As for Mr. Merchant's state law claims against Corizon (Count II and Count III), such claims fail because there was no breach of the standard of care or wrongdoing on the part of any Corizon employee, which is a predicate to proving either claim against Corizon. Moreover, under Idaho law, claims for negligent hiring and negligent supervision require a showing of the employer's own negligence in failing to exercise due care to protect third parties from the foreseeable tortious acts of an employee. *See Rausch v. Pocatello Lumber Co., Inc.*, 135 Idaho 80, 86 (2000); *Doe v. Garcia*, 131 Idaho 578 (1998). There is no evidence in the record of Corizon's *own* negligence in hiring or failing to exercise care to protect third parties. The physicians and providers, including Drs. Agler and Migliori, are experienced and well-trained. (SUF ¶ 35.)

## V.     CONCLUSION

For the foregoing reasons, the Corizon Defendants respectfully request that their Motion for Summary Judgment be granted, and that Plaintiff's Complaint and claims therein against them be dismissed in its entirety.

DATED this 30th day of September, 2019.

PARSONS BEHLE & LATIMER

By: */s/ Dylan A. Eaton*
    Dylan A. Eaton
    Andrew R. Alder
    Counsel for Defendants Corizon, LLC,
    John Migliori, M.D. and David Agler, M.D.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 30th day of September, 2019, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Jason R.N. Monteleone
JOHNSON & MONTELEONE, L.L.P.
jason@treasurevalleylawyers.com
*(Counsel for Plaintiff)*

Leslie M. Hayes
IDAHO ATTORNEY GENERAL'S OFFICE
leslie.hayes@ag.idaho.gov
*(Counsel for Idaho Department of Correction and Warden Keith Yordy)*

By: */s/ Dylan A. Eaton*
    Dylan A. Eaton
    Andrew R. Alder