**Exhibit 1**

# Summary of Findings-Gary Merchant

*Julie M. Madsen, MD, CLCP*

**Medical Records and Care Review**

Gary Merchant was 63 years old in February 2016, when he had the onset of a life-threatening infection of his left lower leg. At the time, he was incarcerated at the Idaho State Correctional Institute. Therefore, he was reliant upon the facility to allow him access to medical care and provide him with reasonable and timely care.

Mr. Merchant completed a Health Services Request (HSR) on February 2, 2016 which stated the following: "URGENT. Water retention mostly L lower leg- 2x larger than R painful to walk and to touch-2nd day NOT receeding (sic)." Merchant was not evaluated for this complaint and completed another HSR on February 3, 2016 that read: "I need size L compression socks to help control the swelling of my legs. Thank you." At this point, he was also experiencing a severe exacerbation of his chronic abdominal pain and diarrhea caused by Chron's Disease. He completed yet another HSR on February 4, 2016 which read: "I haven't seen my Humira on the callout. I believe it is due. Please schedule. URGENT."

On February 4, 2016, Merchant came to the health center for blood tests that had been ordered the week before. He was then "escorted to the provider office to be seen." The nursing notes indicate that he was seen by the provider, John Migliori, MD. However, the progress note authored by Dr. Migliori opens with, "Pt refuses to be seen." Dr. Migliori then orders that Merchant's blood thinning medication (Coumadin) be restarted and that he be given a "short course of Lasix." He prescribed Lasix, a diuretic used primarily to treat heart failure and edema, for two weeks. Merchant was also given a pair of compression stockings on the same date, per the order of Dr. Migliori.

Mr. Merchant's symptoms continued to worsen and he submitted another HSR on February 5, 2016, expressing the concern that he was "still very swollen." At this point, he describes that he was in excruciating pain and barely able to walk. He was triaged to a nurse visit on February 6, 2016, and documentation was completed by B. Shostrum, LPN at 1330 hours. The "Healthcare Documentation form" appears to have been written and signed at this time and

1

**EXHIBIT 1**

then later amended. The form indicates that the nurse "left for an emergency" and (Merchant) "refused to return to medical." Approximately one hour later, a Refusal of Services form was completed by two staff members (V. Hammell and B. Shostrum), but the form was not signed by Merchant, nor was the box checked indicating that Merchant refused to sign the form. There is also no indication that Merchant was given a copy of the form, was informed of the risks of refusal of care, or was referred for any follow-up. At this point, Mr. Merchant indicates that his pain was so severe that he was unable to walk the significant distance to the medical clinic. He was also unable to sit or stand due to pain, and had only minor relief when lying down. Additionally, he was having severe abdominal pain and diarrhea.

Merchant's condition worsened throughout the day on February 6th. Ultimately, he reports that his leg pain was so severe that he could not even walk the short distance to the bathroom. He was also having increased diarrhea and abdominal pain. He reported these symptoms to the staff, who contacted the nurse on duty, Allison Miguez, RN. She documented the interaction as follows: "'Pie called down stating offender is saying having diarreha (sic) because of Chron's flare up and ankle is swollen and can't walk.' Offender stated, 'This is an medical emergency.' I said no it's not a medical emergency. Called on call provider Duncan. Provider stated Chron's is not a new problem and a swollen leg is not a medical emergency, he needs to fill out and HSR to be seen in open sick-call. Offender was told he needed to fill out an HSR." Merchant describes that he felt desperate at this point and reported to staff that he was unable to walk and could not get himself to open sick call on the following day. He reiterated that he was having a medical emergency and needed immediate care, but he was again advised that no other care would be offered or provided and that he would have to wait until the next day.

Merchant describes that he felt that he would die if he waited to be seen until the following day. For this reason, he swallowed a pencil sharpener razor blade, hoping that this would result in him being transferred to a hospital, where he could receive medical care. He immediately reported this to the staff and was evaluated by Jeffery Lybbert, LPN. Lybbert noted that Merchant "displayed severe physical discomfort and dry heaved for one minute grabbing and holding his stomach." The on-call provider (PA Duncan) was contacted and ordered that Merchant be transported to St. Luke's Boise for care. Upon arrival at St. Luke's, Merchant was noted to be critically ill due to a necrotizing soft tissue infection of the left leg. He was also suffering from severe abdominal pain and vomiting related to a flare of his chronic Chron's Disease. Mr. Merchant was ultimately determined to be in severe sepsis with septic shock and he was admitted to the Critical Care Unit with multiple specialists coordinating his care.

Within the first several hours of his hospitalization, Mr. Merchant was evaluated by specialists in critical care, gastroenterology, infectious disease, and surgery. Due to the seriousness of his

2

# EXHIBIT 1

left leg infection, he was taken emergently to the operating room for debridement of extensive areas of dead tissue. He was then returned to the CCU in critical condition with multiple organ system failure. Despite extensive surgery to remove infected tissue in his left leg, his condition continued to deteriorate throughout the day of admission and he was taken back to surgery to have his left leg amputated above the knee, to stop the infection and save his life. He was not medically stable enough to have a final surgery to close the wound on his amputated left leg and provide him with a functional limb stump until February 12, 2016.

While Mr. Merchant was intubated and heavily sedated due to his severe septic shock, it was noted that he had swelling of both arms. A duplex ultrasound was performed on February 10, 2016 to exclude the possibility of blood clots in the arms. No clots were noted. However, when he awakened from sedation, Merchant reported symptoms of weakness and poor coordination in both arms. On February 17th, a CT scan was performed and demonstrated large strokes in the cerebellum of the brain on both sides of the brain. At the time of his discharge on March 8, 2016, it was recommended that he continue to work with physical therapy "due to the stroke and left above the knee amputation."

Mr. Merchant was extubated (removed from a breathing machine and allowed to breath on his own) on February 13th, and suffered from florid delirium for approximately two days after extubation. When his delirium cleared, he reported severe pain in the left leg that was diagnosed by Dr. Patrick Weis as "both wound pain and neuropathic pain." Due to the severity of his pain, he was treated with several narcotic pain medications, as well as Tramadol and Gabapentin. The pain was so severe that Dr. Weis also consulted the orthopedics team to see "if a TENS unit could be placed to help with neuropathic pain." Merchant continued to report pain in the left leg throughout his hospitalization, and continues to suffer from this pain today.

Mr. Merchant had to return to surgery on February 26, 2016 to have sections of his intestines removed and have the ingested foreign body (razor blade) removed. On the prior day, he had a CT scan of the abdomen that demonstrated evidence of small bowel obstruction due to strictures (narrowed segments of intestine) from Chron's Disease. The razor blade, as well as normal products of digestion, were unable to pass the severely strictured area, and the entire segment of bowel was removed and a colostomy was performed.

Mr. Merchant returned to the Idaho State Correctional Institute after being discharged from St. Luke's on March 8, 2016. He did not actually receive his left leg prosthesis until October 3, 2016. This significant delay led to preventable complications, including deconditioning and contractures (muscle shortening and loss of joint range of motion) caused by his confinement

3

EXHIBIT 1

to a wheelchair for an extended period of time. It is important to provide a prosthesis in a timely manner to avoid these complications and encourage the amputee to become independent and proficient in its use. Failure to do so is highly correlated with less success with prosthetic use.

There was no attempt made to address the deficits caused by the strokes that Mr. Merchant suffered while hospitalized, despite this recommendation from the hospital treatment team. As a result, he continues to struggle with speech deficits and left arm weakness. Given that he requires a walker to ambulate in his prosthesis, the arm weakness further limits his prognosis for recovery and independence.

Merchant suffers from chronic pain because of his amputation. He reports that his pain has not been well-controlled since he left the hospital, which also limits his prosthetic use. He has also experienced increased symptoms of depression and anxiety which have not been well-controlled. He also now suffers from urinary incontinence and has a colostomy bag, which contribute to depressed mood. Depression is exceedingly common after amputation, and poorly controlled depression in this population is also associated with difficulties with independent functioning and community reintegration.

**Standard of Care**

The care provided to Gary Merchant by the Idaho State Correctional Facility in the days that preceded his admission to St. Luke's on February 7, 2016 did not meet the community standard of care in several significant ways. First, Mr. Merchant had a long history of Chron's Disease and had noted for several days that his abdominal pain was extremely severe and that he was having vomiting as well as profuse diarrhea. Given the Chron's history and the chronic use of steroids that could mask some pain and place him at higher risk of serious infection if bowel perforation were to occur, it would have been imperative to exclude bowel obstruction and perforation. Despite the severity of his symptoms, a reasonable work-up for his severe abdominal pain was never performed at the Correctional Facility and there is no indication that even a cursory physical examination of the abdomen was performed. Similarly, no reasonable evaluation of his left leg pain was undertaken. In a patient with severe pain and swelling of one extremity, the possibility of blood clots or infection should be investigated immediately. Given Merchant's prior history of congestive heart failure, a heart attack and worsening heart failure should have also been excluded. In this case, no such investigation occurred. Despite the lack

**EXHIBIT 1**

of an evaluation or diagnosis, Dr. Migliori prescribed several therapies, including: prescribing a diuretic (Lasix), resuming a blood thinner (Coumadin), and compression stockings. Prescribing potentially harmful therapies without pursuing a diagnosis is a reckless act that demonstrates a deliberate indifference to the suffering and potentially catastrophic health outcomes for the patient.

Merchant requested medical care in writing five times in the week that led up to his hospitalization. On the night that he was finally sent to the hospital, he requested emergency care verbally and in writing. The response that he received again demonstrated a deliberate indifference to his very grave situation. He was told, "It's not a medical emergency. Chron's is not a new problem and a swollen leg is not a medical emergency." Mr. Merchant felt that he would die if his care was delayed any further, and he swallowed a razor blade in the hopes that it would allow him to receive medical care. Had he not done so, he would have died within a matter of hours due to the severity of the infection in his left leg. The delay in provision of reasonable medical care directly led to his left leg amputation, as well as his subsequent strokes, abdominal surgery, and intestine removal.

## Summary of Findings

It is my opinion that the cumulative failures of the medical providers at the Idaho State Correctional Facility to appropriately treat Gary Merchant directly led to his catastrophically poor outcome. His care was performed in a manner that demonstrated recklessness and deliberate indifference to his health, resulting in unnecessary suffering as well as permanent and severe disability.

My conclusions in this matter are made within a reasonable degree of medical certainty and are based on the records reviewed as well as extensive experience and expertise in the subject matter. My experience includes board certification and clinical practice in the field of emergency medicine as well as extensive experience and practice in wound care and rehabilitation. In my current practice, I routinely care for amputees throughout all stages of their post-amputation recovery and lifespan. The records that I reviewed included records from St. Luke's Regional Medical Center, the Idaho State Correctional Facility/Corizon Health, and Brownfield's Prosthetics and Orthotics . I also conducted a telephone interview with Mr. Merchant on May 23, 2017. This report is not intended to be a complete or final statement of

# EXHIBIT 1

my opinions, and I reserve the right to expand, modify, or amend my opinions as additional information becomes available.

_____  
Julie M. Madsen, MD, CLCP

_____06/17/17_____  
Date

**EXHIBIT 1**