Jason R.N. Monteleone
JOHNSON & MONTELEONE, L.L.P.
350 N. 9th St., ste. 500
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
*jason@treasurevalleylawyers.com*
Idaho State Bar No. 5441

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Gary L. Merchant,<br><br>    Plaintiff<br><br>v.<br><br>Corizon, L.L.C., John Migliori, M.D., David Agler, M.D., and John/Jane Does I-X, whose true identities are presently unknown,<br><br>    Defendants | **Case No. 1:17-cv-00524-BLW**<br><br>**STATEMENT OF DISPUTED FACTS IN OPPOSITION TO CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 57)** |

COMES NOW Plaintiff, by and through his attorneys of record, Jason R.N. Monteleone of Johnson & Monteleone, L.L.P., and, pursuant to D.Id.L.Civ.R. 7.1(c)(2), submits the following statement of disputed facts that demonstrates summary judgment is not appropriate in this case and that the instant matter requires resolution by a jury:

### A.) PLAINTIFF'S SYMPTOMS OF HIS LEG INFECTION AT THE CORRECTIONAL FACILITY/ISCC PRIOR TO BEING TRANSPORTED TO ST. LUKE'S

1. Plaintiff reported symptoms and complaints of lower, left leg swelling and sever pain on at least four (4) occasions between February 2, 2016, and February, 6, 2016, as he reported these symptoms in Health Service Request Forms ("HSRs") he submitted to Corizon

Defendants. *Affidavit of Jason R.N. Monteleone in Opposition to Corizon, LLC, John Migliori, MD, and David Agler, MD's Motion for Summary Judgment* (hereafter "*Affidavit of Counsel*") at ¶16 and Ex. 15 (CORIZON 30, 31, 33, and 34).

2. Continued swelling in Plaintiff's left leg could be consistent with the necrotizing fasciitis process which resulted from the bacterial infection. *Cunagin Depo. at* 29:13-17.[1]

3. Plaintiff's continued swelling in his left leg on February 5, 2016, could be indicative of necrotizing fasciitis. *Cunagin Depo. at* 29:23-30:1-4.

4. Severe left leg swelling and pain having continued to February 6, 2016, would be indicative of necrotizing fasciitis. *Cunagin Depo. at* 30:5-15.

5. The incubation period of Group A streptococcal infections varies, but most have a range of 1-5 days, while other take over a week to cause symptoms; incubation does not occur in a matter of hours. *Cunagin Depo. at* 78:18-79:1-18.

6. Defendant Migliori even admitted that the unilateral leg swelling of which Plaintiff was complaining could be consistent with a soft tissue infection. *Migliori Depo. at* 97:14-20.[2]

7. Dr. Madsen has opined that Plaintiff presented to St. Luke's emergency department, and the diagnosis was made quickly by the intensivist (Dr. Nowbar) and the infectious disease specialist (Dr. Dau). *Madsen Depo. at* 109:2-111:1-16.[3]

8. Plaintiff had severe, +4 pitting edema on February 3, 2016, and this was documented by Nurse Cano, a Corizon employee, on that date. *Madsen Depo. at* 123:7-124:1-5.

---

[1] *Affidavit of Counsel* at ¶7 and Ex. 6 (Deposition of Catherine Cunagin, M.D. (orthopedic surgeon at St. Luke's who performed the amputation of Plaintiff's left leg above the knee)).

[2] *Affidavit of Counsel* at ¶10 and Ex. 9 (Deposition of John Migliori, M.D. (employee of Corizon, L.L.C., Medical Director at ISCC at the relevant times, treated Plaintiff, and Defendant in this action)).

[3] *Affidavit of Counsel* at ¶11 and Ex. 10 (Deposition of Julie Madsen, M.D. (Plaintiff's retained, medical expert on breaches of SOCs, deliberate indifference, causation, and life care planning)).

9. Despite having several, chronic health conditions which he had to manage, Plaintiff never expressed any emergency or urgency relative to his medical needs until his left leg became severely infected. *Madsen Depo. at* 147:11-149:1-10; Affidavit of Counsel at ¶16, Ex. 15 (compilation of Plaintiff's correctional medical records at ISCC) at CORIZON 87).

**B.) PLAINTIFF'S SYMPTOMS AND DIAGNOSES UPON PRESENTATION TO ST. LUKE'S AND SHORTLY THEREAFTER.**

1. Plaintiff presented to the St. Luke's emergency department with edema, tenderness to touch, and bruising in his lower, left leg but not his right leg, which are all potentially indicative of an infection among other medical conditions. *Arthur Depo. at* 33:10-34:1-22.[4]

2. Plaintiff was near death. *Cunagin Depo. at* 25:23-26:1-10.

3. Plaintiff presented to the St. Luke's emergency department with edema, tenderness to touch, and bruising in his lower, left leg but not his right leg, which are all potentially indicative of an infection among other medical conditions. *Arthur Depo. at* 33:10-34:1-22.

4. Plaintiff was near death. *Cunagin Depo. at* 25:23-26:1-10.

5. When Dr. Arthur, a general surgeon, first was treating Plaintiff at the St. Luke's emergency room around 3:00 a.m. on February 7, 2016, Plaintiff had left leg pain and swelling, though the cause was not yet diagnosed. *Arthur Depo. at* 22:18-23.

6. Upon presentation to St. Luke's emergency department, Plaintiff had an elevated white blood cell count, which is suspicious for an infection. *Arthur Depo. at* 22:25-23:8.

---

[4] *Affidavit of Counsel* at ¶6 and Ex. 5 (Deposition of Caroline Arthur, M.D. (general surgeon at St. Luke's who initially examined Plaintiff for the ingested razor blade)).

7. Upon presentation to St. Luke's emergency department, Plaintiff was quickly placed on antibiotics because of the elevated white blood cell count and the possibility of infection. *Arthur Depo. at* 23:15-22.

8. It was clear that Plaintiff's left leg required evaluation upon his presentation to the St. Luke's emergency department. *Arthur Depo. at* 27:10-16.

9. Plaintiff's left leg was infected with a Group A streptococcal infection. *Cunagin Depo. at* 33:24-34:1-3.

10. The infection was so advanced in Plaintiff's left leg, by February 7, 2016, that amputation above the knee was necessary, and a second debridement of the leg would not have been helpful. *Cunagin Depo. at* 44:45:1-3.

11. Plaintiff was already in septic shock, when he was first treated by Dr. Cunagin, which was within several hours of his presentation to St. Luke's Emergency Department. *Cunagin Depo. at* 48:3-15.

12. Dr. Andrew, the emergency department physician who initially treated Plaintiff upon his arrival at St. Luke's Emergency Department, prescribed Zosyn, which is a broad-spectrum antibiotic used to treat bacterial infections such as the one Plaintiff had. *Cunagin Depo. at* 49:21:50:1-6.

13. Plaintiff's left leg was so severely infected that a guillotine amputation was required, so Plaintiff could be immediately returned to the ICU after the amputation procedure. *Cunagin Depo. at* 50:7-51:1-2.

14. From her first examination and throughout her care and treatment of Plaintiff, Dr. Cunagin diagnosed Plaintiff's left leg infection as full-blown necrotizing fasciitis. *Cunagin Depo. at* 55:20-56:1-8.

15. Plaintiff arrived at St. Luke's Emergency Department at 12:35 a.m. on February 7, 2016, and Dr. Cunagin first examined him at 9:30 a.m. on that date. *Cunagin Depo.* at 68:20-69:1-15.

16. Plaintiff had a Group A streptococcal infection which must be diagnosed quickly and treated aggressively, because it is associated with severe, systemic toxicity, necrotizing fasciitis, and is rapidly fatal. *Cunagin Depo.* at 76:23-77:1-22.

17. It was less than twelve (12) hours from Plaintiff's presentation to St. Luke's Emergency Department and the amputation of his left leg above the knee. *Souza Depo.* at 20:19-21:1-4.[5]

18. Had the above-the-knee amputation of Plaintiff's left leg not occurred, Plaintiff would have died very soon from the infection. *Souza Depo.* at 21:18-22:1-15.

19. Dr. Madsen has opined that Plaintiff presented to St. Luke's emergency department, and the diagnosis was made quickly by the intensivist (Dr. Nowbar) and the infectious disease specialist (Dr. Dau). *Madsen Depo.* at 109:2-111:1-16.

20. The emergency department physician at St. Luke's, Dr. Andrew, must have suspected Plaintiff was infected, because he promptly prescribed a broad-spectrum antibiotic, Zosyn, upon Plaintiff's presentation to St. Luke's. *Madsen Depo.* at 233:16-235:1-18.

21. Dr. Dau diagnosed Plaintiff with necrotizing fasciitis due to a streptococcal/bacterial infection in the morning of February 7, 2016. *Dau Affidavit* at ¶¶7 and 8.[6]

---

[5] *Affidavit of Counsel* at ¶8 and Ex. 7 (Deposition of James Souza, M.D. (St. Luke's Vice-President of Medical Quality at St. Luke's who wrote Corizon Defendants requesting an investigation into Plaintiff's access to medical care at ISCC prior to Plaintiff's presentation to St. Luke's)).

[6] *Affidavit of Birgitt Dau, M.D.* (Dkt. 56) (Infectious Disease specialist who treated Plaintiff shortly after his presentation to St. Luke's late on February 6, 2016, or early on February 7, 2016)).

**STATEMENT OF DISPUTED FACTS IN OPPOSITION TO CORIZON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Dkt. 57) - - 5**

22. On February 2, 2016, Plaintiff had symptoms consistent with a bacterial infection of the soft tissue of Plaintiff's left leg. *Cunagin Depo.* at 28:5-22.

23. By the evening of February 6, 2016, Plaintiff's infected, left leg was a medical emergency, which had been disregarded by two (2) of Corizon's employees, a nurse and a physician assistant (Miguez and Duncan). This involved both breaches of applicable SOCs as well as manifest, deliberate indifference to Plaintiff's medical needs by Corizon employees. *Madsen Depo.* at 144:20-147:1-5.

24. By 10:30 a.m., when she dictated her first chart note regarding her care and treatment of Plaintiff, Dr. Nowbar had necrotizing fasciitis in Plaintiff's left leg as part of her differential diagnosis. *Nowbar Depo.* at 22:8-16.[7]

25. Dr. Nowbar diagnosed the cellulitis upon her first, clinical examination of Plaintiff, which would have been on February 7, 2016. *Nowbar Depo.* at 28:3-20.

C.) **APPLICABLE STANDARDS OF CARE ("SOCs") IN THIS CASE AND THE BREACHES OF THOSE SOCs WHICH REQUIRED HIGH SUSPICION AND EARLY DETECTION OF PLAINTIFF'S LEG INFECTION, TREATMENT WITH ANTIBIOTIC MEDICATION, AND MORE TIMELY TRANSFER TO AN INFECTIOUS DISEASE SPECIALIST OR HOSPITAL.**

1. In his deposition, Defendant Migliori testified that the applicable SOCs in this case required that an off-site infectious disease consult be readily available, that it is important to have that off-site consult available, when an inmate's condition warranted it, yet he could not even testify to whether Plaintiff needed that infectious disease consult during the period of time from January 28, 2016, through February 7, 2016. *Migliori Depo.* at 52:14-54:1-5.

---

[7] Affidavit of Counsel at ¶12 and Ex. 11 (Deposition of Sogol Nowbar, M.D. (intensivist at St. Luke's who treated Plaintiff for his streptococcal infection both before and after the leg amputation)).

2. At no time during his medical care and treatment of Plaintiff in late January and early February of 2016 did Defendant Migliori ever have any concern that Plaintiff had a soft tissue infection. However, Defendant Migliori admitted that leg swelling, such as Plaintiff complained about on February 2, 2016, could be consistent with a soft tissue infection. *Migliori Depo.* at 93:22-93:1-17.

3. In early 2016, Corizon employees had the capability to diagnose a soft tissue infection such as Plaintiff's through a blood study; however, that was never used. *Migliori Depo.* at 128:9-14.

4. IDOC policy required Corizon to provide Infectious Disease consultations for inmates away from the correction facility. *Affidavit of Counsel* at ¶18 and Ex. 17.

5. IDOC policy required Corizon to timely transfer inmates to specialty clinics and/or community hospital services, when an acute illness is present. *Affidavit of Counsel* at ¶19 and Ex. 18.

6. Timely diagnosis, broad-spectrum antibiotic therapy, and aggressive surgical debridement are the keys to treating Group A streptococcal infections which lead to necrotizing fasciitis. *Cunagin Depo.* at 77:24-78:1-17.

7. Because of the insidious nature of the infections that lead to necrotizing fasciitis, healthcare professionals must have a high level of suspicion, so the diagnosis of the infection is not missed. This is especially true in immunocompromised patients such as Plaintiff. *Souza Depo.* at 23:1-21.

8. Dr. Madsen is familiar with SOCs for mid-level providers such as nurse practitioners and physician assistants as well as nurses and other ancillary staff, as she oversees them as a physician. *Madsen Depo.* at 9:2-10:1.

9. Dr. Madsen has specific experience with the Veterans Administration's Boise amputee clinic. This assists and advises her in drafting life care plans for amputees. *Madsen Depo. at* 66:7-70:1-9.

10. Dr. Madsen supervised nurses and midlevel providers during the relevant times to the instant action. *Madsen Depo. at* 70:10-71:1-14.

11. Dr. Madsen has treated patients with necrotizing fasciitis. *Madsen Depo. at* 74:3-75:1-8.

12. In treating a Boise patient with necrotizing fasciitis, Dr. Madsen ordered a CT scan to detect fascial gas and necrosis. *Madsen Depo. at* 77:18-78:1-16.

13. As a wound care specialist at Idaho Elks Wound Care Clinic, Dr. Madsen treated a patient with necrotizing fasciitis who presented with the same symptoms as Plaintiff (i.e. pain beyond that shown clinical examination, swelling, and redness). *Madsen Depo. at* 79:8-81:1-18.

14. Dr. Madsen has opined that the gold standard for diagnosing necrotizing fasciitis is pathology studies, though radiologic studies are helpful as well but can delay the therapeutic treatment of the infection. *Madsen Depo. at* 82:7-21.

15. Dr. Madsen's conversation about healthcare at a prison south of Boise with Christian Gelok, N.P., was entirely innocent and without importance sufficient to include in her expert reports. *Madsen Depo. at* 94:24-100:1-6.

16. SOCs are the same in the correctional setting as they are for the community at large. *Madsen Depo. at* 131:8-133:1-15.

17. Dr. Madsen is familiar with the SOCs related to the evaluation of edema, the treatment of infection, the evaluation of immunocompromised patients, and the evaluation of cardiac patients with a reasonable degree of medical certainty. *Madsen Depo. at* 163:17-164:1-3.

18. Dr. Madsen is familiar with the SOCs related to the evaluation of edema, the treatment of infection, the evaluation of immunocompromised patients, and the evaluation of cardiac patients with a reasonable degree of medical certainty. *Madsen Depo.* at 163:17-164:1-3.

19. At no time during his medical care and treatment of Plaintiff in late January and early February of 2016 did Defendant Migliori ever have any concern that Plaintiff had a soft tissue infection. However, Defendant Migliori admitted that leg swelling, such as Plaintiff complained about on February 2, 2016, could be consistent with a soft tissue infection. *Migliori Depo.* at 93:22-93:1-17.

20. Though Defendant Migliori admitted that reducing blood flow to a limb with a soft tissue infection could be contraindicated, he still prescribed compression stockings to Plaintiff in early February 2016. *Migliori Depo.* at 99:6-100:1-2.

21. In a patient with a soft tissue infection, the continued, subcutaneous injection of Humira would be contraindicated; nevertheless, Corizon employees continued to do so even on February 5, *Migliori Depo.* at 101:8-17.

22. The medical care provided to Plaintiff was suboptimal. *Madsen Depo.* at 116:10-16.

23. Dr. Madsen has opined that Defendant Migliori's medical treatment of Plaintiff did not meet the applicable SOC, because he failed to diagnose and properly treat the left leg infection early. *Madsen Depo.* at 116:17-117:1-25.

24. Defendant failed to recognize clear signs of infection in Plaintiff, even though he reviewed Plaintiff's laboratory studies on February 4, 2016. *Madsen Depo.* at 118:16-119:1-19.

25. Defendant Migliori failed to appreciate the very harmful possibility of a soft tissue infection in Plaintiff's left leg and prescribed a medication, Lasix, which was contraindicated. *Madsen Depo.* at 124:21-125:1-11.

26. Defendant Migliori did not formulate a high index of suspicion for the signs of infection which Plaintiff was writing down in his HSRs. *Madsen Depo. at* 128:7-14.

27. Dr. Madsen's opinions relative to the Corizon Defendants' deficient, medical care are summarized in her expert report. *Madsen Depo. at* 137:17-139:1-15.

28. Corizon Defendants rendered substandard and deliberately indifferent, medical care to Plaintiff, because they claim that Plaintiff refused care on February 6, 2016, when, in fact, Plaintiff could not return to the medical unit at the correctional facility, because he was unable to walk on his infected leg and was having frequent bowel movements related to his Crohn's Disease. *Madsen Depo. at* 140:19-144:1-7.

29. No reasonable evaluation of Plaintiff's severe, left leg pain was performed by the Corizon employees during the time frame from February 2-6, 2016, at the correctional facility. *Madsen Depo. at* 158:15-24.

## D.) DELIBERATE INDIFFERENCE AND NEGLIGENT HIRING/RETENTION

1. Defendant Migliori cannot even identify whether Plaintiff was in a dire, medical condition, when Plaintiff presented to St. Luke's emergency department late on February 6, 2016. Nor could Defendant Migliori even identify, during his deposition, what Plaintiff's, his patient's, health condition was in the days leading up to the hospitalization at St. Luke's. *Migliori Depo. at* 47:7-23.

2. Defendant Migliori testified in his deposition that he did not know whether Plaintiff even needed an infectious disease consult at any time from January 28, 2016, through February 7, 2016. *Migliori Depo. at* 54:11-24.

3. Defendant Migliori cannot even identify the proper SOC for scheduling an off-site, infectious disease consult in a patient exhibiting signs and symptoms of necrotizing fasciitis. *Migliori Depo. at* 56:11-19.

4. Defendant Migliori admitted that Plaintiff was never provided with an infectious disease consult, but he could not testify as to why that consult never occurred. *Migliori Depo. at* 58:6-22.

5. Defendant Migliori cannot even identify whether Plaintiff was a compliant, concerned patient who was interested in his own health. *Migliori Depo. at* 74:9-17.

6. Even on February 4, 2016, despite leg swelling and severe pain, Defendant Migliori cannot even state whether a soft tissue infection should have been on Plaintiff's differential diagnosis. *Migliori Depo. at* 102:10-24.

7. Corizon is responsible, under its contract with IDOC, to pay for inmates' medical bills incurred away from the correctional facility. *Migliori Depo. at* 148:23-150:1-3.

8. Dr. Madsen has opined that Defendant Migliori acted with deliberate indifference to the medical needs of Plaintiff and thereby violated the applicable SOCs. *Madsen Depo. at* 129:15-131:1-7.

9. Dr. Madsen's opinions relative to the Corizon Defendants' deficient, medical care are summarized in her expert report. *Madsen Depo. at* 137:17-139:1-15.

10. IDOC policy required Corizon to provide Infectious Disease consultations for inmates away from the correctional facility. *Affidavit of Counsel* at ¶18 and Ex. 17.

11. Corizon Defendants rendered substandard and deliberately indifferent, medical care to Plaintiff, because they claim that Plaintiff refused care on February 6, 2016, when, in fact, Plaintiff could not return to the medical unit at the correctional facility, because he was

unable to walk on his infected leg and was having frequent bowel movements related to his Crohn's Disease. *Madsen Depo. at* 140:19-144:1-7.

12. By the evening of February 6, 2016, Plaintiff's infected, left leg was a medical emergency, which had been disregarded by two (2) of Corizon's employees, a nurse and a physician assistant (Miguez and Duncan). This involved both breaches of applicable SOCs as well as manifest, deliberate indifference to Plaintiff's medical needs by Corizon employees. *Madsen Depo. at* 144:20-147:1-5.

13. Dr. Souza, St. Luke's Vice-President of Medical Quality, wrote a letter to Corizon, dated March 10, 2016, requesting an investigation into whether Plaintiff had adequate access to healthcare at ISCC prior to Plaintiff's admission to St. Luke's on February 7, 2016. *Affidavit of Counsel* at ¶17 and Ex. 16.

14. In 2016, Dr. Souza was the Vice-President of Medical Affairs for St. Luke's Health System, when he wrote the Corizon Defendants on March 10, 2016, requesting an investigation into Plaintiff's access to medical care at ISCC; and he later became the Chief Medical Officer for the entire health system in 2017. *Souza Depo. at* 8:20-9:1-19.

15. Dr. Souza and his critical care colleague, Patrick Weis, were concerned that there had been a delay in Plaintiff receiving medical care prior to his presentation to St. Luke's Emergency Department. That concern was validated. In turn, Dr. Souza wrote a concerning letter to Corizon's Medical Director relative to the concern over the delay in Plaintiff's receipt of medical treatment while incarcerated. *Souza Depo. at* 12:14-14:1-19.

16. Though Dr. Souza requested that Corizon undertake an investigation into any delay in Plaintiff's medical care, while incarcerated, he never heard back from Corizon, nor did

STATEMENT OF DISPUTED FACTS IN OPPOSITION TO CORIZON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Dkt. 57) - - 12

Corizon ever formulate a plan of action and provide it to St. Luke's, as requested by Dr. Souza. *Souza Depo.* at 26:23-27:1-14.

17. Dr. Souza, as St. Luke's Vice-President of Medical Affairs, wrote a letter to Corizon requesting an investigation into whether Plaintiff had adequate access to healthcare at ISCC prior to Plaintiff's admission to St. Luke's on February 7, 2016. *Affidavit Counsel* at ¶17 and Ex. 16.

### E.) CAUSATION

1. Plaintiff's leg was amputated to prevent an infection in that leg from progressing further. *Migliori Depo.* at 36:11-20.

2. Continued swelling in Plaintiff's left leg could be consistent with the necrotizing fasciitis process which resulted from the bacterial infection. *Cunagin Depo.* at 29:13-17.

3. Plaintiff's left leg was infected with a Group A streptococcal infection. *Cunagin Depo.* at 33:24-34:1-3.

4. Patients who have atrial fibrillation and are removed from their anticoagulant therapy such as Coumadin, which Plaintiff was taking but was removed from it in order to undergo surgeries to treat the streptococcal infection, are at a higher risk for an ischemic stroke, which is what Plaintiff suffered during his hospitalization at St. Luke's. *Whiteside Depo.* at 43:1-45:1-3.[8]

5. Defendant Migliori could not offer any reason to doubt that necrotizing fasciitis was the condition requiring the amputation. *Migliori Depo.* at 38:12-22.

6. Earlier treatment of Plaintiff's infection would have avoided the amputation that followed. *Madsen Depo.* at 128:15-22.

---

[8] *Affidavit of Counsel* at ¶9 and Ex. 8 (Deposition of James Whiteside, M.D. (neurologist at St. Luke's who treated Plaintiff for an ischemic stroke following the amputation of Plaintiff's leg)).

7. Streptococcus pyogenes was the bacteria that caused the infection in Plaintiff's left leg. *Nowbar Depo.* at 15:18-22.

8. The streptococcal infection caused renal failure as well as cardiovascular injury and respiratory injury as well as septic shock. *Nowbar Depo.* at 16:24-17:1-6.

9. The streptococcal infection caused the sepsis and septic shock. *Nowbar Depo.* at 22:3-6.

10. Plaintiff's left leg was the source of the infection which contributed to the septic shock. *Nowbar Depo.* at 23:7-24:1-3.

11. Plaintiff's multi-organ failure, his lactic acidosis, and the need for ventilator support all related to the streptococcal infection. *Nowbar Depo.* at 27:13-17.

12. Plaintiff's acute, renal failure, acute respiratory failure, and the above-the-knee amputation of his left leg were all caused by the streptococcal infection. *Nowbar Depo.* at 28:21-29:1.

13. The streptococcal infection caused Plaintiff's multi-organ failure, rendered him critically ill, and left him at a high risk of deterioration. *Nowbar Depo.* at 34:6-19.

14. The streptococcal infection caused an increase in Plaintiff's preexisting, atrial fibrillation. *Nowbar Depo.* at 35:25-36:1-23.

15. A streptococcal cellulitis process likely began on February 2, or 3, 2016, which, when left untreated with antibiotic therapy, manifested in necrotizing fasciitis which necessitated the amputation of Plaintiff's left leg. *Dau Affidavit* at ¶¶11 and 12.

**F.) PLAINTIFF WAS IMMUNOCOMPROMISED DUE TO HIS MEDICATIONS, AND THIS CREATED A HIGHER RISK OF INFECTION AND MADE IT MORE LIKELY FOR PLAINTIFF TO BECOME INFECTED.**

1. Plaintiff is an immunocompromised patient due to taking Humira and chronic use of Predisone for his Crohn's Disease, and these medications made it more likely that Plaintiff

could become infected and would thus be at a higher risk for the development of necrotizing fasciitis. *Cunagin Depo. at* 31:25-33:1-4.

2. Plaintiff was an immunocompromised patient, and that means he was at an increases risk for life-threatening infections. *Souza Depo. at* 18:16-19:1-12.

3. Immunocompromised patients who are taking Humira for Crohn's Disease, such as Plaintiff, are at a higher risk for infections. *Whiteside Depo. at* 41:12-20.

4. During the times he was prescribing Humira to Plaintiff, Defendant Migliori was aware that that medication increased the risk of soft tissue infection. *Migliori Depo. at* 47:24-49:1-18.

5. Prednisone, a steroid, can increase the risk of soft tissue infection. *Migliori Depo. at* 63:11-16.

6. Plaintiff was an immunocompromised patient due to the Humira and prednisone he was taking; as such, he was at a much higher risk for infection, and the Corizon employees needed to be in tune with that fact. *Madsen Depo. at* 149:23-151:1-12.

7. Patients such as Plaintiff, who are taking biologic medications such as Humira for Crohn's Disease, are at a higher risk for bacterial infections. *Nowbar Depo. at* 31:3-6.

8. Plaintiff is an immunocompromised patient, and he is thus more susceptible to streptococcal infections. *Dau Affidavit* at ¶¶7 and 15.

### G.) SWALLOWING THE RAZOR BLADE DID NOT CAUSE AND WAS NOT A SUBSTANTIAL FACTOR IN PLAINTIFF'S LEFT LEG INFECTION.

1. Swallowing the razor blade did not cause or play any role in the streptococcal infection which necessitated the amputation of Plaintiff's leg: Group A streptococcal infections

result from skin pathogens, not gastrointestinal pathogens. *Dau Affidavit* at ¶¶9 and 14; *Spellberg Depo.* at at 37:17-15, 45:20-46:6, 52:1-14, and 69:17-71:19.[9]

2. Plaintiff swallowed the razor blade in order to be transported to an emergency room or hospital away from the correctional facility, because he did not believe that he was receiving appropriate, medical care at the correctional facility. *Arthur Depo.* at 18:17-19:4.

3. Plaintiff swallowed the razor blade, because he was not satisfied with the quality of care he was receiving at the correctional facility and wanted to be transported to a hospital away from the correctional facility for medical treatment. *Whiteside Depo.* at 49:16-50:1-24.

4. Plaintiff's swallowing of the razor blade did not cause the necrotizing fasciitis which necessitated the amputation of Plaintiff's left leg above the knee. *Cunagin Depo.* at 31:16-23.

5. It is unlikely that Plaintiff's swallowing of the razor blade played any role in the soft tissue infection roiling in Plaintiff's left leg. *Nowbar Depo.* at 19:23-20:1-11.

H.) **CROHN'S DISEASE DID NOT CAUSE PLAINTIFF'S LEG SWELLING AND EDEMA.**

1. Crohn's Disease would not cause unilateral swelling in Plaintiff's left leg. *Nowbar Depo.* at 20:17-22.

2. The swelling in Plaintiff's left leg, during February 2-6, 2016, was not due to Crohn's Disease. *Dau Affidavit* at ¶10.

I.) **PLAINTIFF DID NOT REFUSE MEDICAL CARE DURING JANUARY 29, 2016, THROUGH FEBRUARY 6, 2016, AND CORIZON DEFENDANTS' MEDICAL RECORDS DO NOT DEMONSTRATE THAT ASSERTION.**

---

[9] *Affidavit of Counsel* at ¶15 and Ex. 14 (Deposition of Brad Spellberg, M.D. (Plaintiff's rebuttal expert on Infectious Diseases)).

1. Defendant Migliori charted that Plaintiff refused to be seen on February 4, 2016; however, Defendant Migliori prescribed Lasix and compression stockings for Plaintiff on that date. In turn, Defendant Migliori is either mistaken about the alleged refusal or care, or he prescribed treatments for Plaintiff on that date without even having seen him. *Madsen Depo.* at 126:23-128:1-5.

2. The medical record is unclear whether Plaintiff actually refused medical care on February 6, 2016, because his vital signs were taken on that date. *Madsen Depo.* at 135:22-136:1-23.

3. The medical records are very inconsistent as to whether Plaintiff actually ever refused care; there are references to dates of service, when Plaintiff allegedly refused care from Dr. Migliori, though Corizon's ancillary staff was able to draw blood and take vital signs from Plaintiff on those same dates. Dr. Madsen cannot fathom how that could occur. *Madsen Depo.* at 160:19-163:1-11.

### J.) EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. To address inmate medical complaints, the inmate would complete an HSR, and that HSR would generally be triaged by a nurse within twenty-four (24) hours. *Migliori Depo.* at 139:2-140:1.

2. IDOC inmates use HSRs to request medical services; the grievance procedure is used, when an inmate disagrees with a decision, policy, action taken by IDOC, and the inmate wants to challenge it. *Yordy Depo.* at 133:24-134:1-9.[10]

---

[10] *Affidavit of Counsel* at ¶13 and Ex. 12 (Deposition of Keith Yordy (an IDOC warden)).

**STATEMENT OF DISPUTED FACTS IN OPPOSITION TO CORIZON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT (Dkt. 57) - - 17**

## K.) DR. MADSEN'S LIFE CARE PLAN AND ESTIMATE OF PLAINTIFF'S FUTURE, MEDICAL COSTS ARE RELIABLE AND BASED ON ACCEPTED METHODOLOGIES.

1. Dr. Madsen is properly certified and credentialed to perform life care planning. Madsen Dr. Madsen relied on appropriate date to formulate her life care plan for Plaintiff, including medical records, speaking to Plaintiff, limitations due to the amputation, stroke, Crohn's Disease, and psychiatric information, and reviewing Plaintiff's goals, prior level of function, and previous vocational/avocational interests. *Depo. at* 170:18-176:1-2.

2. In formulating her life care plan for Plaintiff, Dr. Madsen considered Plaintiff's average lifespan under the Social Security guidelines, his health comorbidities, the fact he was incarcerated, and his date of release from prison. *Madsen Depo. at* 180:8-189:1.

3. In preparing her life care plan for Plaintiff, Dr. Madsen obtained the current costs of medical charges from St. Alphonsus Health System, as Plaintiff identified that facility as the one, where he would likely obtain care with conveniently located clinics in the Boise area. *Madsen Depo. at* 192:1-196:1-5.

DATED: This 22nd day of October, 2019.

JOHNSON & MONTELEONE, L.L.P.

/s/ Jason R.N. Monteleone
Jason R.N. Monteleone
Attorneys for Plaintiff

**CERTIFICATE OF MAILING, DELIVERY, OR FACSIMILE TRANSMISSION**

I CERTIFY that, on October 22, 2019, I caused a true and correct copy of the foregoing document to be:

| | |
|---|---|
| ❑ Mailed<br>❑ Hand Delivered<br>☒ CM/ECF Electronic Filing<br>❑ iCourt E-File<br>❑ Transmitted Fax Machine to:<br>❑ Transmitted Via E-Mail to: *KWest@parsonsbehle.com*<br>    *DEaton@parsonsbehle.com*<br>    *AAlder@parsonsbehle.com* | J. Kevin West, Esq.<br>Dylan A. Eaton, Esq.<br>Andrew Alder, Esq.<br>PARSONS, BEHLE & LATIMER<br>800 W. Main Street, ste. 1300<br>Boise, ID  83702 |

JOHNSON & MONTELEONE, L.L.P.

*/s/ Jason R.N. Monteleone*
Jason R.N. Monteleone
Attorneys for Plaintiff